**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JEREMY FULLER,

        Plaintiff,

    v.

CABINETWORKS MICHIGAN, LLC,
THE CABINETWORKS GROUP, and
CABINETWORKS GROUP, INC.,

        Defendants.

No. 4:24-CV-01618

(Chief Judge Brann)

**MEMORANDUM OPINION**

**JULY 3, 2025**

## I.  BACKGROUND

In September 2024, Plaintiff Jerry Fuller filed a one-count complaint against Defendants, Cabinetworks Michigan, LLC, The Cabinetworks Group, and Cabinetworks Group, Inc., alleging a violation of the Fair Labor Standards Act.[1] Defendants filed a motion to compel mediation/arbitration and to stay the case in November 2024.[2] In December 2024, Fuller filed a motion for conditional certification of two classes.[3] Also in December 2024, Defendants filed a motion to

---

[1]   Complaint, Doc. 1.
[2]   *See* Motion to Compel Mediation/Arbitration and to Stay the Case ("MTCA"), Doc. 6 at 2-3; Declaration, Doc. 6-2; Exhibits to Declaration, Doc. 6-3.
[3]   Motion to Certify Class, Doc. 8.

stay any decision on the motion for conditional certification until after the Court ruled on the motion to compel.[4]

This Court resolved the motions in January 2025.[5] It granted the motion to stay, holding that Section 4 of the Federal Arbitration Act ("FAA") "prohibits the Court from reaching any of Fuller's motions" until a final determination has been made on whether Fuller agreed to arbitrate his claims.[6] Accordingly, the Court stayed Fuller's motion for conditional certification and held the motion to compel mediation/arbitration in abeyance "until a final determination is made as to whether Fuller is bound by the disputed arbitration agreement."[7] The Court ordered the parties to engage in limited discovery.[8] After the conclusion of discovery, Defendants filed a motion for summary judgment in April 2025.[9] The motion for summary judgment is now ripe for disposition. For the reasons stated below, it is denied.

## II.    STANDARD OF REVIEW

Section Two of the Federal Arbitration Act provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable."[10] But a court only "make[s] an order directing the parties to proceed to arbitration in accordance with the terms

---

[4]    Motion to Stay, Doc. 12 at 1.
[5]    Memorandum, Doc. 17; Order, Doc. 18.
[6]    Memorandum, Doc. 17 at 13.
[7]    Order, Doc. 18 ¶1.
[8]    Order, Doc. 21.
[9]    Motion for Summary Judgment, Doc. 23.
[10]   9 U.S.C. § 2.

of the agreement" if it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue."[11] Where "the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof;" this means that after limited discovery into factual disputes, the Court applies the Rule 56 summary judgment standard and allows the arbitrability dispute to proceed to trial if necessary.[12]

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[13] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[14] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[15] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[16]

---

[11]  9 U.S.C. § 4.
[12]  9 U.S.C. § 4; *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013).
[13]  Fed. R. Civ. P. 56(a).
[14]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[15]  *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).
[16]  *Id*.

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[17] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[18] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[19] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[20]

Although "more reliable forms of proof should be used in place of or to supplement an affidavit when that is possible and appropriate," the "use of affidavits rather than other forms of proof on a summary-judgment motion is left to the discretion of each of the parties."[21] But because of the shortcomings of relying on affidavits at summary judgment, Rule 56 sets out several limitations. Such affidavits must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."[22]

---

[17]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[18]  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[19]  Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[20]  Fed. R. Civ. P. 56(c)(3).

[21]  10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (4th ed. 2025).

[22]  Fed. R. Civ. P. 56(c)(4).

## III.    STATEMENT OF FACTS

### A.    Background

Plaintiff Jeremy Fuller is currently employed as a machine operator at the Cabinetworks plant located in Sayre, Pennsylvania.[23] Cabinetworks first hired Fuller as an hourly production worker on June 9, 2021.[24] Fuller voluntarily resigned his employment with Cabinetworks in July 2022 but was then rehired by Cabinetworks in September 2022.[25] This case involves disputes over whether Fuller agreed to arbitrate claims relating to his employment on two occasions.

At the heart of this dispute lies a document titled "Dispute Resolution Program" (the "DRP").[26] The DRP subjects employees to binding arbitration by the American Arbitration Association for "all covered claims and disputes between the Company and the Employee," including disputes related to "wages or other compensation due; [and] breach of contract."[27] It extends to include a "Class Action Waiver."[28] The DRP also states at various points that, by commencing employment with Cabinetworks, the employee agrees to its terms, and that "no signature shall be

---

[23]    Defendants' Statement of Undisputed Material Facts ("SUMF"), Doc. 25 ¶1; Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("RSUMF"), Doc. 29 ¶1.

[24]    SUMF, Doc. 25 ¶2; RSUMF, Doc. 29 ¶2.

[25]    SUMF, Doc. 25 ¶3; RSUMF, Doc. 29 ¶3.

[26]    Exhibit C - Dispute Resolution Agreement, Doc. 26-3.

[27]    *Id.* at 2-3. This excludes claims and disputes "resolved through either the Company's Open Door Policy or other informal or human resource channels," neither of which is relevant here. *Id.*

[28]    *Id.* at 4.

required for this Program to become effective."[29] The narrow focus of this summary judgment motion is whether the Plaintiff in this case is bound by that agreement, either based on his actions when he was initially hired in June 2021 or when he was rehired in September 2022.

### B.    June 2021 Hiring Process

Fuller was first hired on June 9, 2021.[30] When Fuller was hired, a portion of the pre-hire orientation was completed online, and a portion of the pre-hire orientation was completed in-person with paper forms.[31] As part of the pre-hire orientation, a Cabinetworks human resources professional would give new hires copies of the relevant policies and procedures, as well as a Checklist Acknowledgement Form which verified that the employees received the relevant new hire documentation.[32] In June 2021, the new hire packet at the Sayre plant's orientation included various documents, one of which was the "Dispute Resolution Policy Acknowledgement."[33] As part of the new hire orientation, the new hires never signed the DRP nor did Defendants' human resources professionals collect the

---

[29]  *Id.* at 2, 8, 9.
[30]  SUMF, Doc. 25 ¶3; RSUMF, Doc. 29 ¶3.
[31]  SUMF, Doc. 25 ¶12; RSUMF, Doc. 29 ¶12.
[32]  SUMF ¶13; RSUMF ¶13 (denying that Fuller ever received the DRP itself, which Paragraph 13 does not claim, and failing to deny any of Paragraph 13's contents).
[33]  SUMF, Doc. 25 ¶14; RSUMF, Doc. 29 ¶14.

signed DRP from the new hires.[34] Jennifer Rinker, a Cabinetworks human resources manager, conducted Fuller's orientation.[35]

The parties dispute whether Fuller received the DRP at the June 9, 2021 orientation Rinker conducted. Rinker states that employees are generally given the DRP to take home with them and review and notes that it is her "standard practice" to do so, specifically when guiding new hires through the Checklist Acknowledgement Form, and to explain each document listed on the Checklist Acknowledgement Form.[36] From this the Rinker declaration concludes that Rinker must have given Fuller "his copy of the Dispute Resolution Program Agreement on or before the date indicated on" the Checklist Acknowledgement Form.[37] In his declaration, Fuller states unequivocally: that he never received the DRP or any other document consenting to arbitration; that he was never told about binding arbitration during this process or given the DRP; and that he has "never seen or read that document [the DRP] before filing this action."[38] These clashing testimonies create a

---

[34] SUMF, Doc. 25 ¶19; RSUMF, Doc. 29 ¶19.

[35] SUMF, Doc. 25 ¶¶15-16; RSUMF, Doc. 29 ¶¶15-16.

[36] Exhibit G – Declaration Jennifer Rinker, Doc. 26-7 ¶¶9-15; Exhibit D – Jennifer Rinker Deposition Excerpts, Doc. 26-4 at 14:8-15:6, 17:11-17, 19:21-20:7. Cheryl Walker, another Cabinetworks human resources professional, made similar statements that the DRS is typically distributed as part of the June 2021 onboarding process in her declaration. Exhibit A – Declaration of Cheryl Walker, Doc. 26-1 ¶7.

[37] Exhibit G – Declaration Jennifer Rinker, Doc. 26-7 ¶16.

[38] Exhibit A – Fuller Declaration, Doc. 27-3 ¶¶18, 21. Defendants cite Fuller's deposition for the proposition that "Plaintiff did not deny that he reviewed the Dispute Resolution Program or that he agreed to arbitrate all disputes," but instead testified "that he did not remember." SUMF, Doc. 25 ¶26. But in the Deposition transcript to which Defendants cites, Fuller only states that he does not recall whether anyone *told him* that he was agreeing to arbitrate claims or giving up a right to a jury trial. Fuller did *not* state in this portion of the deposition transcript that he

genuine dispute, and it is resolved in Fuller's favor for the purposes of summary judgment.

As part of his orientation, Fuller signed the aforementioned "Full Time Hire Forms Checklist" (the "Checklist") on June 9, 2021, a one-page checklist listing various forms; the Checklist items include "Dispute Resolution Policy Acknowledgement" and "Handbook Acknowledgement," both of which Rinker checked off.[39] Like other new hires, Fuller also signed the Handbook Acknowledgement referenced in the Checklist, which was collected at the end of orientation and saved in that employee's personnel file.[40] The Handbook Acknowledgement states, in relevant part: "I further agree to the Dispute Resolution Policy, which is a separate, contractual obligation between the Company and me."[41]

## C.    October 2022 Hiring Process

At the time of Fuller's re-hire in fall of 2022, the Sayre plant's orientation process had changed, and new hires generally reviewed and signaled assent to the

---

could not recall whether he agreed to arbitration. Exhibit H – Jerry Fuller Deposition Excerpts, Doc. 26-8 at 50:10-16 ("Q. Did anyone in your orientation in 2021 tell you that you were agreeing to arbitrate all claims against the company? A. I do not remember. Q. Did anyone tell you that you were giving up your right to a jury trial? A. I do not remember."). In any case, Defendants offer no response to Fuller's Declaration—which firmly states that Fuller never received the document—and do not attempt to invoke the sham affidavit doctrine. The Court will not apply it *sua sponte* here.

[39]   Exhibit F - Full Time Hire Forms Checklist, Doc. 26-6 at 2; SUMF, Doc. 25 ¶¶21-22; RSUMF, Doc. 29 ¶¶21-22.

[40]   Exhibit I - Acknowledgement Form, Doc. 26-9; SUMF, Doc. 25 ¶¶24-25; RSUMF, Doc. 29 ¶¶24-25.

[41]   Exhibit I - Acknowledgement Form, Doc. 26-9 at 2.

DRP electronically within Defendant's Workday system.[42] The parties therefore dispute whether Fuller agreed to the DRP through Workday following his re-hire.

Fuller's Workday password expired periodically and he would have to reset it.[43] On the morning of October 24, 2022, Fuller attempted to sign onto Workday via an application on his phone, but his Workday password had expired and he could not access the system.[44] When Fuller needed assistance, he tended to reach out to Cabinetworks employee Melissa Ashby.[45]

When he could not access Workday on October 24, Fuller sent an email to Ashby at 5:32 A.M., asking for her assistance in resetting his Workday password.[46] Ashby responded to Fuller's email at 5:54 A.M. by advising him that she would reset his password and that he could stop by the HR office later that day, where Ashby would provide him with the new password.[47] Although Fuller did stop in to see Ashby, he is not asked when he did so and does not state at what time this occurred.[48]

At 6:01 A.M., Ashby reset Fuller's password.[49] What happened next is disputed, but the parties agree on several things. It is at least clear that, at 9:45 A.M.,

---

[42] SUMF, Doc. 25 ¶27; Exhibit A – Declaration of Cheryl Walker, Doc. 26-1 ¶9. Plaintiff only denied that Fuller assented to the DRP and did not dispute this characterization of Defendants' *general* orientation process in fall 2022; it is therefore admitted for the purposes of this motion. RSUMF, Doc. 29 ¶27 (only denying Fuller's assent to the DRP).

[43] SUMF, Doc. 25 ¶29; RSUMF, Doc. 29 ¶29.

[44] SUMF, Doc. 25 ¶28; RSUMF, Doc. 29 ¶28.

[45] SUMF, Doc. 25 ¶¶30-31; RSUMF, Doc. 29 ¶¶30-31.

[46] SUMF, Doc. 25 ¶30; RSUMF, Doc. 29 ¶30; Exhibit K - Cabinetworks-000160, Doc. 26-11.

[47] SUMF, Doc. 25 ¶32; RSUMF, Doc. 29 ¶32.

[48] Exhibit D – Fuller Deposition Transcript, Doc. 27-6 at 26:18-20.

[49] SUMF, Doc. 25 ¶33; RSUMF, Doc. 29 ¶33.

*someone* logged into Fuller's account through a phone;[50] that at 9:49 A.M., *someone* logged into Fuller's account again through a Desktop;[51] and that at 9:51 A.M., *someone* reviewed and electronically signed the DRP in Fuller's Workday account.[52] It is also clear that Fuller previously logged onto Workday with a phone, but that the person who logged onto Workday using Fuller's credentials at 9:45 AM and 9:51 AM did so on a desktop computer.[53] The DRP does not contain Fuller's physical signature.[54] The person who logged onto Fuller's account also reviewed several other documents and completed a W4 form.[55] The parties dispute who signed in under Fuller's name, reviewed these documents and completed the W4 form, and—most importantly—e-signed the DRP with Fuller's signature.

---

[50] Exhibit M - Fuller Deposition Exh. 3, Doc. 27-15 (Cabinetworks log showing that someone logged onto Fuller's account at 9:45 A.M.); SUMF, Doc. 25 ¶36; RSUMF, Doc. 29 ¶36 (both parties agreeing, at least, that *someone* logged onto the account at 9:45 A.M.).

[51] Exhibit H – Fuller Deposition Exh. 12, Doc. 27-10 (Cabinetworks log showing that someone logged onto Fuller's account at 9:49 A.M. using a desktop); Polisetty Deposition at 20:2-16; RSUMF, Doc. 29 ¶41 (agreeing, at least, that *someone* logged onto the account at 9:49 A.M. via desktop).

[52] Exhibit C - Dispute Resolution Agreement, Doc. 26-3 at 9 (electronic signature at 9:51 A.M.); Exhibit E – Fuller Deposition Exh. 4, Doc. 27-7 (Cabinetworks log showing that someone logged onto Fuller's account reviewed and signed the DRP at 9:51 A.M.).

[53] Polisetty Deposition, 20:2-16.

[54] Dispute Resolution Program Agreement, Doc. 26-3 at 9.

[55] SUMF, Doc. 25 ¶¶44-46; RSUMF, Doc. 29 ¶¶44-46 (disputing that these actions were performed by Fuller but otherwise agreeing that the log reflects that these documents were reviewed and the W4 form was completed by the same person who logged in with Fuller's credentials); Exhibit E – Fuller Deposition Exh. 4, Doc. 27-7 (Cabinetworks log reflecting that someone logged in with Fuller's credentials reviewed onboarding documents, signed the DRP agreement, and reviewed other documents at 9:51 A.M.); Exhibit N – Fuller Deposition Exh. 7, Doc. 27-16 (data showing that Fuller's W-4 Election was effective 10/24/2022 and was last updated 10/24/2022 at 9:57 A.M.).

Citing a declaration from Senior Human Resources Manager Ady Polisetty, Defendants contend (1) that "[t]he Workday audit data shows that Ms. Ashby did not access Plaintiff's Workday account on October 24, 2022 after resetting Plaintiff's password and requiring him to create a new password upon his next access of Workday" and (2) that "[t]he Workday audit data shows that at 9:45 AM, Plaintiff signed onto Workday and was required to change his password and to establish challenge questions."[56]

In Workday, challenge questions are used as an extra layer of security when setting a password; a workday user selects the challenge question and provides the answer to it, and if they later need to recover their password, they can input an answer to the challenge question to gain access to the system.[57] In support, Polisetty therefore further states in her declaration that "[t]he Workday shows that" the person who logged into the account "selected, and provided answers to, the following challenge questions on October 24, 2022: What was your high school mascot? What street did you grow up on? What is the name of the company of your first job? What was the name of the city you were born?"[58] The same new password was used to access Fuller's Workday account on November 3, 9, 28, December 1, 8, and 21, 2022, and January 15, 2023, both at home and while at work at the Sayre facility.[59]

---

[56]   Exhibit J – Ady Polisetty Declaration, Doc. 26-10 ¶¶9-10; SUMF, Doc. 25 ¶¶34, 36.
[57]   SUMF, Doc. 25 ¶37; RSUMF, Doc. 29 ¶37.
[58]   Exhibit J – Ady Polisetty Declaration, Doc. 26-10 ¶12.
[59]   *Id.* ¶17.

Fuller points to Polisetty's own deposition in response, wherein she stated that there is no way to tell from the audit records which human being logged into Fuller's account—just that someone with Fuller's password did so.[60]

Polisetty clarified the basis for her assertions in a subsequent Declaration, appended to Defendants' Reply Brief:

> Some HR employees have the ability to reset the password of a user. Doing so will generate a temporary, one-time password, which may then be given to the user. Once the user logs on with that temporary password, however, the user will be required to establish a new password to access their account. No one in HR has access to the password a user sets after logging on with the one-time, temporary password. The Workday audit data shows that Melissa Ashby reset Plaintiff Jerry Fuller's password at 6:01 AM on October 24, 2022, a process that generated a one-time temporary password. The audit records do not show that Ms. Ashby accessed Mr. Fuller's account after that. The Workday audit record also showed that Jerry Fuller's Workday account logged on to Workday with the temporary password at 9:41 AM on October 24, 2022. That user, whom I believe to be Mr. Fuller, was then required to change his password and to set personalized "challenge questions" at 9:45 AM. I believe Mr. Fuller was the person that set his new password on October 24, 2022 at 9:45 AM because a user using this same password accessed Workday several times between November of 2022 and January of 2023, including to view Mr. Fuller's pay slip.[61]

Fuller provides some additional evidence that he did not log into Workday at 9:45 A.M. on October 24, 2022. Fuller states that he has only logged into Workday from his iPhone and has never logged in from a desktop computer; that he does not

---

[60]   Exhibit F – Polisetty Deposition Transcript, Doc. 27-8 at 20:21-21:8 ("Q. But there's nothing in the computer records that tells us who actually signed in as Jerry Fuller at 9:49, is there? A. Technically, no.")
[61]   Declaration, Doc. 32-1 ¶¶5-8.

12

own any desktop computer at his home; and that he does not own any desktop computer at his job.[62] He further states that he recalls setting challenge questions in the past but does not recall whether he did so on October 24, 2022 specifically.[63] Additionally, the person who logged in with Fuller's credentials changed Fuller's emergency contact to "Andrea Fuller,"[64] but Fuller testifies that his wife's name is Andrea Klett, not Andrea Fuller.[65] Fuller further testifies that while the original W-4 form he filled out stated that his wife did not work multiple jobs, the W-4 form filled out during this session in his account stated that his wife did have multiple jobs, despite no intervening change in her employment status.[66]

Fuller also states that he does not recall one way or the other whether he filled out this W-4 form, and does not know whether he reviewed the various Cabinetworks documents which were reviewed during this login session according to the data audit.[67] Fuller also points to portions of Walker and Polisetty's depositions, in which Walker states that Ashby could have signed into Fuller's

---

[62] Exhibit D – Fuller Deposition Transcript, Doc. 27-6 at 20:4-18; Exhibit H – Jerry Fuller Deposition Excerpts, Doc. 26-8 at 51:3-16.

[63] Exhibit D – Fuller Deposition Transcript, Doc. 27-6 at 29:7-25.

[64] Exhibit F – Polisetty Deposition Transcript, Doc. 27-8 at 23:22-24:8. The exhibit referenced in the deposition does not, at least in the screenshot provided to the Court, show that Jeremy Fuller's emergency contact was changed to "Andrea Fuller." *See* Doc. 27-7. However, Polisetty agrees in her deposition that this is reflected in the substance of the data audit, which is sufficient to create a genuine dispute on this question.

[65] Exhibit D – Fuller Deposition Transcript, Doc. 27-6 at 34:6-17.

[66] Fuller Deposition, Doc. 27-6 at 10:22-11:20, 12:20-13:3, 13:4-11.

[67] Fuller Deposition at 11:23-12:5, 36:7-16, 37:1-38:3.

account if Fuller gave her his password, and Polisetty states that the computer cannot indicate whether Ashby ever logged in using Fuller's credentials.[68]

In Fuller's deposition, when he is asked whether he "make[s] room in [his] mind for the possibility that Exhibit 10, the ADR agreement, was one of the materials that [he] looked at on October 24, 2022," Fuller states that he does "not remember looking at" the DRP.[69] When asked "[o]ne way or the other?" Fuller responds "I don't recall."[70] Defendants interpret this testimony to mean that Fuller "does not recall one way or the other whether he accessed and acknowledged the DRP Agreement on October 24, 2022."[71] The following question, however, asks Fuller: "No one at the company at any time told you the arbitration agreement did not apply to you, did they?"[72] Fuller responds: "No. No one spoke to me about this."[73] Fuller's answer to Defendants' deposition question is ambiguous,[74] but his declaration is clearer: "I did not sign or otherwise agree to the "Dispute Resolution Program" . . .

---

[68]  RSUMF, Doc. 29 ¶40 (citing Exhibit B – Walker Deposition Transcript, Doc. 27-6 at 26:13-25; Exjonot F – Polisetty Deposition Transcript, Doc. 27-8 at 16:7-20).

[69]  Exhibit H – Jerry Fuller Deposition Excerpts, Doc. 26-8 at 39:24-40:23.

[70]  *Id.* at 40:15-23.

[71]  SUMF, Doc. 25 ¶43.

[72]  Exhibit H – Jerry Fuller Deposition Excerpts, Doc. 26-8 at 40:24-41:1.

[73]  *Id.* at 41:2.

[74]  Fuller's statement that he does "not remember looking at" the DRP could be read as a statement that he does not "make room in his mind for the possibility" that he saw it. Likewise, when Fuller is asked whether he remembers "one way or the other" whether he saw the DRP, his response of "I don't recall" could be read as a statement that he does not recall seeing or signing the agreement.

I never seen or read that document before filing this action . . . I did not and do not agree to submit the disputes in this action to mediation or binding arbitration."[75]

The parties weigh this evidence differently. Defendants argue that Fuller's uncertainty regarding his login cannot create a genuine dispute when faced with Polisetty's clear declaration about why Fuller must have been the one to log in and sign the DRP.[76] Fuller argues that the Court should apply the sham affidavit doctrine to preclude Polisetty's declaration.[77] The Court need not wade into the sham affidavit doctrine, however, because it concludes that a genuine dispute exists even considering Polisetty's affidavits.

The Court agrees that "non-probative evidence definitionally cannot create a genuine dispute of fact in the face of probative evidence."[78] But this does not describe Fuller's case regardless of how Fuller's testimony is interpreted.

First, Fuller unambiguously states in his declaration that he did not electronically sign the DRP in Workday and this alone is sufficient to create a dispute of fact, especially alongside the other circumstantial evidence introduced by Fuller.

---

[75]   Exhibit A – Fuller Declaration, Doc. 27-2 at ¶¶21-22.

[76]   Brief in Support, Doc. 25 at 13; Reply, Doc. 32 at 1-2.

[77]   Brief in Opposition, Doc. 27 at 5-7. The sham affidavit doctrine provides that "[w]hen a nonmovant's affidavit contradicts earlier deposition testimony without a satisfactory or plausible explanation, a district court may disregard it at summary judgment in deciding if a genuine, material factual dispute exists." *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391-92 (3d Cir. 2017).

[78]   *Riley v. Clark*, No. 4:20-CV-00325, 2025 U.S. Dist. LEXIS 61626, at *38-39 (M.D. Pa. Mar. 31, 2025). *See also West v. Lincoln Benefit Life Co.*, 509 F.3d 160, 172 (3d Cir. 2007) ("Evidence that is merely colorable or not significantly probative is insufficient to create a genuine issue of material fact for trial.").

Defendants only focus on their interpretation of Fuller's deposition testimony without otherwise distinguishing the declaration or—more noticeably—attempting to raise the sham affidavit doctrine themselves. Nor is there any noticeable contradiction between the declaration and the deposition in this regard; Fuller's deposition responses do not unambiguously communicate that he is completely uncertain as to whether he signed the DRP in Workday.

Second, even on Defendants' interpretation of the record that Fuller cannot remember "one way or the other" whether he signed the DRP or logged into Workday, *neither* Polisetty *nor* Fuller is certain whether Fuller signed the document. *Both* witnesses, instead, infer that Fuller must or must not have logged into the system and e-signed the DRP based on circumstantial evidence.

As Defendants have clarified, there is no way to conclusively verify that Fuller is the one who logged in with his credentials, and rather, Polisetty *believes* that it must have been Fuller based on her understanding of the Workday system: the challenge questions and temporary password; Fuller's subsequent logins after the password reset; the W-4 form; and other reviewed forms.[79] Fuller, likewise, *at most* cannot remember whether he logged in and e-signed the DRP in Workday, but points out that: he has never logged into Workday on a desktop computer and did not have access to one; that the document is only e-signed; the W-4 form and emergency

---

[79] Declaration, Doc. 32-1 ¶¶5-8.

contact information entered during the session contained discrepancies; and the sign-in happened just several hours after Ashby accessed Fuller's account to reset his password. This does not fully account for Polisetty's explanation of Workday's temporary password and challenge question mechanics, but at summary judgment, it is enough to create a genuine dispute. A reasonable factfinder could discard the inconsistent Polisetty explanations, or not, depending on the credibility of the witnesses and the persuasiveness of the other circumstantial evidence in the case.

These factual disputes should be resolved at trial. Accordingly, they will be construed in Fuller's favor for purposes of summary judgment: Fuller did not log into the Workday system from a desktop computer at 9:51 A.M., someone else reviewed the documents in his account and filled out the W-4 form on his behalf, and someone else added his electronic signature to the DRP.

Having resolved all genuine disputes of fact in Fuller's favor for purposes of summary judgment, the Court proceeds to determine whether the record requires granting summary judgment in Defendants' favor.

## IV.    ANALYSIS

Defendants argue that Fuller agreed to the DRP in both June 2021 and October 2022. This Court's discussion of the factual record resolves Defendants' motion with respect to the alleged October 2022 agreement: because a reasonable factfinder could conclude that Fuller did not sign into Workday, much less view and sign the

DRP, on October 24, 2022, this is an improper basis on which to grant summary judgment.

That leaves the issue of whether Fuller agreed to the DRP in June 2021. Acknowledging that Fuller never signed the DRP during the June 2021 orientation, Defendants argue that he agreed to it by signing the Checklist and the Handbook Acknowledgement.

As discussed, the Handbook Acknowledgement states: "I further agree to the Dispute Resolution Policy, which is a separate, contractual obligation between the Company and me."[80] However, there exists a dispute of fact, construed in Fuller's favor for purposes of summary judgment, as to whether Fuller ever saw the Dispute Resolution Policy to begin with. Therefore, the issue is whether an employee can accept a contract incorporated by reference in a handbook acknowledgement agreement when he is never provided with the underlying contract itself.

"To determine whether the parties agreed to arbitrate, we turn to ordinary state-law principles that govern the formation of contracts."[81] "When federal courts answer questions of state law, they rule as they predict the state supreme court would,"[82] "giv[ing] serious consideration to the decisions of the intermediate

---

[80] Exhibit I - Acknowledgement Form, Doc. 26-9 at 2.

[81] *Kirleis v. Dickie, McCamey & Chilcote P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quoting *First Options of Chic., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

[82] *Gov't Emps. Ins. Co. v. Mount Prospect Chiropractic Ctr., P.A.*, 98 F.4th 463, 467 (3d Cir. 2024).

appellate courts."[83] "Before concluding that there is a valid contract under Pennsylvania law, the court must 'look to: (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration."[84]

Under Pennsylvania contract law, this question has been settled under the first element of contract formation: mutual intent to be bound. In *Quiles v. Financial Exchange Co.*, the Superior Court of Pennsylvania confronted very similar factual scenario: an employee had signed a form stating that she had received, understood and agreed to the terms of the employee handbook including its "Dispute Resolution Program and provisions relating to arbitration," but the employee never received the handbook for review despite requesting it and the form never explained that the handbook contained an arbitration clause.[85] *Quiles* distinguished these facts from the ordinary principle that "[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood"[86] by reasoning that "[h]ere, without a copy of the Handbook, Quiles was not even given the opportunity to read the terms of the arbitration agreement."[87] Accordingly, there was no "meeting of the minds" between the plaintiff and her

---

[83]  *Robinson v. Jiffy Executive Limousine Co.*, 4 F.3d 237, 242 (3d Cir. 1993) (citations omitted).

[84]  *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002) (quoting *ATACS Corp. v. Trans World Comms., Inc.*, 155 F.3d 659, 666 (3d Cir. 1998)).

[85]  879 A.2d 281, 283-84 (Pa. Super. Ct. 2005).

[86]  *Simeone v. Simeone*, 581 A.2d 162, 165 (Pa. 1990).

[87]  *Quiles*, 879 A2d at 285.

employer because "the terms of the process were never fully communicated to her."[88]

The United States Court of Appeals for the Third Circuit explicitly relied upon and approved of *Quiles* to hold that mutual assent was lacking under Pennsylvania law in *Kirleis v. Dickie McCamey & Chilcote, P.C.*, wherein a law firm partner was not bound to arbitrate her employment dispute despite the firm's bylaws containing an arbitration provision.[89] Finding *Quiles* to be "apposite" and reviewing it in "some detail," the *Kirleis* court concluded that the partner was not bound by the arbitration provision because she "never received a copy of the only document containing the firm's arbitration provision. Without this document, Kirleis could not have explicitly agreed to arbitrate her claims."[90] The Third Circuit further adopted this reasoning in *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*[91] Accordingly, the Third Circuit's adoption of *Quiles*'s rationale as an accurate statement of Pennsylvania law would ordinarily be binding on this Court absent further clarification from the Pennsylvania Supreme Court itself, and *Kirleis*'s adoption of *Quiles*'s rationale would therefore decide this motion.

Defendants argue in their reply brief, however, that "*Quiles* is predicated on Pennsylvania jurisprudence the United States Supreme Court has implicitly

---

[88]  *Id.* at 285, 288.
[89]  560 F.3d 156, 159-160, (3d Cir. 2009).
[90]  *Id.* at 165.
[91]  *Guidotti*, 718 F.3d at 778-779.

overruled."[92] It is well-settled that the Federal Arbitration Act is designed to place arbitration agreements "on equal footing with all other contracts,"[93] and as such, the FAA pre-empts decisions that take their "meaning precisely from the fact that a contract to arbitrate is at issue."[94] Accordingly, as the Supreme Court more explicitly clarified in *AT&T Mobility LLC v. Concepcion* and *DIRECTV, Inc. v. Imburgia* following *Quiles*, *Kirleis* and *Guidotti*, any state-law rule which does not place arbitration contracts on equal footing with other contracts is preempted by the Federal Arbitration Act.[95]

This argument has some facial appeal. The 1964 Pennsylvania Supreme Court decision of *Emmaus Municipal Authority v. Eltz* held that "arbitration agreements are to be strictly construed and that such agreements should not be extended by implication," but rather must be agreed to in "a clear and unmistakable manner."[96] Though no decision of which this Court is aware analyzes whether *Emmaus* is preempted by the FAA, its rationale appears to be at odds with the Supreme Court's

---

[92] It is worth noting that Defendants do not contend that *Kirleis* is similarly abrogated, even though this would be the necessary implication in light of *Kirleis*'s reliance on *Quiles*.

[93] *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)

[94] *Perry v. Thomas*, 482 U.S. 483, 489 n.9 (1987).

[95] *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341-352 (2011); *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 53-54 (2015).

[96] *Emmaus Municipal Authority v. Eltz*, 204 A.2d 926, 927 (Pa. 1964).

guidance.[97] And this problematic *Emmaus* language makes two noticeable appearances in *Quiles*,[98] as well as in *Kirleis*.[99]

Nor is *Quiles* itself a model of clarity. Almost all *Quiles*'s reasoning purports to apply generally applicable principles of Pennsylvania contract law to conclude that mutual assent is lacking where a contractual term is never communicated; *Quiles* chiefly relies upon the non-arbitration case of *Morosetti v. Louisiana Land and Exploration Co.*; and *Quiles* distinguishes cases in which parties have simply failed to read a contract by explaining that the plaintiff "was not even given the opportunity to read the terms."[100] All this is done without singling out arbitration agreements.

---

[97] *See, e.g.*, Gary B. Born & Adam Raviv, *Arbitration and the Rule of Law: Lessons from Limitations Periods*, 27 Am. Rev. Int'l Arb. 373, 401-402 & n.169 (2016) (invoking *Emmaus* as an example of the kind of "heightened requirements for the formal and substantive validity of arbitration agreements" which has been "decisively rejected by contemporary arbitration legislation and judicial decisions in the United States and elsewhere.").

[98] *Quiles*, 879 A.2d at 287 ("However, such agreements are upheld only where it is clear that the parties have agreed to arbitrate in clear and unmistakable manner. *Emmaus* . . . .[T]he court properly determined that the parties had not 'agreed to arbitrate in [a] clear and unmistakable manner.' *Emmaus, supra*.").

[99] *Kirleis*, 560 F.3d at 161, 163. Likewise, *Kirleis* and *Guidotti*, at least in part, also rely upon a now-abrogated rule which had previously placed heightened burdens upon the enforceability of arbitration contracts. *See Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980) ("Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect."); *Kirleis*, 560 F.3d at 161 (relying on this reasoning); *Guidotti*, 716 F.3d at 773, 775 (relying on this reasoning); *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288 (3d Cir. 2017) (to the extent prior decisions interpreted this as "a substantive standard that applies to the determination of an arbitration agreement's enforceability as a general matter," such standard is "no longer valid after the Supreme Court's decision in *First Options of Chicago, Inc. v. Kaplan*").

[100] *Quiles*, 879 A.2d at 285 ("Case law generally equates the process of interpreting contracts, applying the same principles in both types of cases."), *id.* (setting out generally applicable principles of mutual assent articulated in *Cohn v. Penn Beverage Co.*, 169 A. 768-69 (Pa. 1934)); *id.* at 286 (relying upon *Morosetti* to reason that publication of the arbitration policy in employee handbooks "has no binding effect on employment-related actions if that policy is

But, *Quiles* then cites to *Emmaus* in explaining that the employee's signature of an acknowledgement form did not create mutual assent, and in doing so, appears to endorse a special rule disfavoring arbitration.[101] More confusingly still, *Quiles* then concludes by pointing to the lack of mutual assent in the case and "reaffirms the basic precept that 'in determining whether parties have agreed to arbitrate, courts should apply the rules of contractual construction, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties.'"[102]

In sum, *Quiles* is less than clear and its citations to *Emmaus* are concerning. It does purport to apply general principles of Pennsylvania contract law, and subsequent courts have continued to rely on *Quiles* and *Kirleis* after *Concepcion* and *Imburgia*, similarly tying their reasoning to a lack of mutual assent, so one might argue that *Quiles* does not create special rules disfavoring arbitration.[103] Yet it might

---

never actually communicated to an employee by ensuring that the handbooks are distributed to its employees."); *Morosetti v. Louisiana Land and Exploration Co.*, 564 A.2d 151, 152 (Pa. 1989) (holding that an employer's severance policy was not binding because the policy was "never communicated as part of a definite offer of employment"); *Quiles*, 879 A.2d at 286-87.

[101] *Quiles*, 879 A.2d at 287

[102] *Id.* at 287 (quoting *Highmark Inc. v. Hosp. Serv. Ass'n of Northeastern Pa.*, 785 A.2d 93 (Pa. Super. 2001)).

[103] Concerningly, however, most of these decisions cite the *Emmaus* language with no explanation of why it would not be preempted by the FAA. *See Schuchmann v. Great Am. Power*, C.A. No. 3:23-cv-1604, 2024 U.S. Dist. LEXIS 10391, at *7-11 (M.D. Pa. Jan. 19, 2024) (Mannion, J.) (relying on *Quiles* and *Kirleis* to conclude that mutual assent was lacking where a plaintiff, despite agreeing to defendant company's "terms and conditions" over a phone call, did not actually receive those terms and conditions, which included an arbitration provision, until after the call); *Dicent v. Kaplan Univ.*, 758 F.App'x 311, 313 (3d Cir. 2019) (citing *Kirleis*); *Scott v. Educ. Mgmt. Corp.*, 662 F.App'x 126, 131 (3d Cir. 2016); *Mikeladze v. Raymours Furniture Co.*, Civil Action No. 20-2224, 2020 U.S. Dist. LEXIS 230919, at *10 (E.D. Pa. Dec. 8, 2020);

further be argued that *Quiles* and its progeny, despite at times *purporting* to apply general principles of Pennsylvania contract law, do no such thing.[104] Having framed the issue and closely inspected the authorities cited by the parties, the Court concludes that it would be unwise to pass upon this issue given the lack of briefing offered by the parties.

Defendants' brief preemption argument implicitly pointed to *Quiles*'s reliance on *Emmaus* but did not otherwise provide clarification as to how *Quiles*'s mutual assent analysis is inconsistent with contract principles applied outside of the arbitration context. "A passing reference to an issue" is generally considered

---

*Carr v. First Commw. Bank*, 293 A.3d 299 (Pa. Super. Ct. 2023). *See also* 1 Corbin on Pennsylvania Contracts § 2.08 (citing *Schuchmann* in a general discussion of clauses purporting to limiting liability and noting that "Whether such a clause will be legally operative typically depends on whether it is sufficiently conspicuous or otherwise called to the attention of the party against whom it is designed to operate.").

[104] *See* Steven J. Burton, *The New Judicial Hostility to Arbitration: Federal Preemption, Contract Unconscionability, and Agreements to Arbitrate*, 2006 J. DISP. RESOL. 469, 499 (citing *Quiles*'s quotation of *Emmaus*'s requirement that arbitration agreements be concluded in a "clear and unmistakable manner" as an example of courts that "have been more straightforward about their prejudice" towards arbitration agreements). Some cases appear to imply that Pennsylvania courts' treatment of incorporation by reference differs outside of the arbitration context. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 534 (3d Cir. 2009) ("[U]nder Pennsylvania law, arbitration provisions, like other contractual provisions, may be incorporated by reference through general incorporation provisions"); *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 761 (3d Cir. 2016) (quoting *Std. Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir. 2003)) ("[I]ncorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship."); *Roller v. Red Payments LLC*, No., 2019 U.S. Dist. LEXIS 135911, at *16-17 (E.D. Pa. Aug. 12, 2019). It is unclear, however, whether some non-arbitration-based principle—such as the agreement arising in the employment context—otherwise justifies *Quiles*'s outcome. *See, e.g.*, *Std. Bent Glass Corp.*, 333 F.3d at 447 n.10 (noting that its "harsh" approach to incorporation by reference "might very well be different" if "the matter here involved a non-merchant . . . or if the reference to arbitration had been buried").

insufficient to raise it.[105] "Mere allusion or reference is not enough; the issue must actually be raised with a minimum level of thoroughness."[106] As the United States Court of Appeals for the Seventh Circuit has infamously stated, "Judges are not like pigs, hunting for truffles buried in briefs."[107]

The scope of Defendants' argument also does not clearly implicate the concerns the Court raised above. Defendants only attempt to avoid *Kirleis* and *Guidotti* by drawing the same factual distinction that Fuller never received the arbitration agreement in this case; they never argue that those decisions—which simply import *Quiles*—are similarly applying preempted state law.[108] More importantly, regardless of whether *Quiles*'s mutual assent analysis singles out arbitration agreements for disfavored treatment, Defendants *never* attempt to explain whether someone in Fuller's position[109] would be bound under ordinary principles of Pennsylvania contract law.

Finally, the entirety of Defendants' opening brief was premised on contesting whether a genuine dispute of fact existed regarding Fuller's receipt of the arbitration

---

[105] *Laborers Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994). *See also Teleglobe Comms. Corp. v. BCE, Inc. (In re Teleglobe Comms. Corp.)*, 493 F.3d 345, 376 (3d Cir. 2007) ("To raise an issue, a party must present it with sufficient specificity to allow this court to pass on it.").

[106] *Seifert v. Pa. Human Relations Comm'n*, 301 F.App'x 194, 196-97 (3d Cir. 2008).

[107] *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam).

[108] *Id.* at 6-9.

[109] *I.e.*, someone who signed an acknowledgement form confirming his acceptance of a separate agreement containing an arbitration provision, without ever receiving that separate agreement.

agreement.[110] Defendants did not raise their preemption argument until their reply brief.[111] "Arguments raised for the first time in a reply brief are generally waived. Fairness requires that nonmovants have the opportunity to respond to any arguments presented by the movant."[112] Aside from fairness, the timing of this argument also deprives the Court of the benefit of briefing from Fuller on this question.

Were this issue simpler, perhaps the Court would resolve it now to expedite the case. However, *Quiles* and its progeny, notably *Kirleis*, have garnered ongoing reliance from the state and federal courts. No decision appears to have analyzed whether their rationale remains sound.[113] And resolving this question would require the Court to conduct a broad-ranging analysis of Pennsylvania contract law. Under these circumstances, the Court does not think it wise to resolve what is effectively an issue of first impression without briefing. "[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the

---

[110] Brief in Support, Doc. 24, *generally*.

[111] Reply Brief, Doc. 32 at 7-8.

[112] *Dommel Properties, LLC v. Jonestown Bank and Trust Co.*, Civil Action No. 11-cv-2316, 2013 U.S. Dist. LEXIS 129295, at *3 n.1 (M.D. Pa. Sep. 11, 2013).

[113] Defendants cite *Juric v. Dick's Sporting Goods*, but *Juric* is not on point. Reply Brief, Doc. 32 at 8. *Juric* found no genuine dispute as to whether any plaintiffs received a copy of the arbitration agreement at issue, and for that reason never squarely addressed, aside from some brief dicta, whether this is a ground for the agreement's unenforceability under Pennsylvania law, nor did it address whether *Quiles* has been preempted. *Juric v. Dick's Sporting Goods*, No. 2:20-CV-00651-MJH, 2020 U.S. Dist. LEXIS 137299, at *10-11 (W.D. Pa. Aug. 3, 2020) ("It is apparent from the face of the Complaint and supporting documents that all Opt-in Arbitration Plaintiffs received a copy of the Arbitration Agreement. Accordingly, the Court rejects Plaintiffs' challenge to Defendant's Motion to Compel Arbitration on the basis that Purported Opt-In Arbitration Plaintiffs failed to receive a copy of the Arbitration Agreement.").

parties present."[114] While courts retain the discretion to "identify and apply the proper construction of governing law" "[w]hen an issue or claim is properly before the court,"[115] passing upon undeveloped arguments both implicates notice concerns for the opposing party and risks misapplying the law.

Accordingly, the Court denies summary judgment due to the lack of mutual assent to the DRP based on *Quiles* and *Kirleis* and finds the preemption argument to be forfeited for purposes of this summary judgment motion.[116]

## V.    CONCLUSION

Construing all genuine disputes of fact in Fuller's favor, Defendants are not entitled to summary judgment. A reasonable factfinder could conclude that Fuller never signed into Workday and signed the arbitration agreement in October 2022. A reasonable factfinder could also conclude that despite signing the Acknowledgement Form during his initial September 2021 orientation, Fuller never received the DRP. *Quiles* and *Kirleis* hold that the parties lack mutual assent under such circumstances, and the question of whether those decisions have been abrogated is not properly before the Court. The parties shall proceed to trial to resolve these factual disputes.

An appropriate Order follows.

---

[114]  *United States v. Sineng-Smith*, 590 U.S. 371, 375 (2020).

[115]  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

[116]  The Court has chosen this course rather than requesting supplemental briefing on the question. This does not preclude Defendants from raising the argument in their post-trial briefings. The Court expresses no view on the underlying question.

27

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge